Good morning, your honors. May it please the court. I'd like three minutes for rebuttal if I may. The district court in this case, your honors, made three fundamental mistakes when it granted habeas relief. The first mistake was to bypass a clear procedural default. That argument is laid out in our brief in detail. And if the court has questions, I'll be happy to answer that, but given the limited nature of the time, I'd like to concentrate on the second two fundamental errors that the district court made. The second error that the district court made was to conclude that there was clearly established law when in fact there is not. The law relied upon by both the petitioner and the district court is at the highest level of generality and is no more specific than the notion of fundamental fairness itself. But I mean, you can have clearly established principles that are a high level of generality, right? No, your honor, I would say that's not true. You can have a general legal principle that may, in very limited circumstances, be extended to a set of facts that is not identical to the one that's at issue in the Supreme Court case. How about this way of thinking about it? AEDPA gives you two different ways to upset a state court ruling. One is to contradict a Supreme Court decision on point, okay? So their generality stuff might matter a lot. And the other one is to unreasonably apply Supreme Court precedent. I'm thinking of this as a case about the unreasonable application of clearly established Supreme Court precedent. That's not exactly correct, your honor. You must unreasonably apply clearly established Supreme Court law. I know, that's what I'm saying. So in this case, he has to both show that there is clearly established Supreme Court law and that it was unreasonably applied. You don't think it's clearly established that you can have state evidentiary rulings be so flawed and prejudicial that they violate due process? I thought that principle was established. I think there is an established principle of due process that says that evidential errors may be fundamentally unfair and violate due process. But cases, United States Supreme Court cases and other circuit cases, are clear that that is not enough for clearly established law. The Tenth Circuit in House v. Hatch said it was something akin to on-point holdings before it could become clearly established. And the Supreme Court has illustrated this clearly in cases like Wright v. Van Patten, Kerry v. Mousladen, Panetti v. Quarterman. These cases stand for the proposition and all the cases, circuit cases, that have interpreted those line of Supreme Court cases have said that the Supreme Court has drastically limited the universe of law that can be deemed clearly established law. And so I would disagree that there is clearly established law, although there is a general principle that fundamental unfairness can result in due process. And here is what we have with this first fundamental error that the District Court made. We have no Supreme Court cases at all applying a due process analysis to the admission of a hearsay statement. Doesn't Dowling stand for that point? No. In fact, Dowling actually supports the state's position because in that case, first of all, Dowling ruled that it was admissible. So it ruled for the state in that case. But we're a junior varsity court, so if they say this rule exists, we have to follow it, even though in Dowling they denied relief to the criminal defendant. Dowling did not involve the admission of a hearsay statement made spontaneously, voluntarily, without intent to curry favor to a compatriot or a friend. That is not what Dowling involved. The facts are inopposite. And in fact, Dowling says in there that outside of the specific enumerated Bill of Rights that the category of infractions that would constitute a due process violation are very narrow. I think it said limited, but limited doesn't mean non-existent. That's right. And there could be a category of facts in which the Supreme Court has spoken which could give rise to due process, but this is not one. Out of the 40 cases that were cited by Petitioner and the District Court, not one involved a factual scenario remotely like this. Most of the ones cited didn't even involve a due process analysis. Some of them weren't even United States Supreme Court cases. What do you say about this case, I don't know how to pronounce it, Ege? Ege v. Eukins. Okay, what about that case? The Sixth Circuit case in which this court ruled that scientific evidence in which I might add the state had already ruled was inadmissible, violated or was fundamentally unfair and granted Carol Ege habeas relief. That case is of no import because the facts are completely dissimilar. There's no similarity between the admission of evidence of a scientific nature that the state court has already ruled as inadmissible under their state law. Not only is that not an on-point holding, that's not even akin to an on-point holding. Why isn't it quite relevant? I thought the point was that usually state court evidentiary rulings are not going to be the grounds for a due process claim. That's the rule. But Ege is an exception. It shows that, well, there are some state court evidentiary rulings that are going to violate due process. Okay, so why isn't this one of them? Because this court did not hold in Ege v. Eukins that evidence... That was an AEDPA case, right? Yes, Ege was an AEDPA case. But this court did not hold in Ege that fundamental fairness was violated by the admission of evidence pursuant to state evidentiary rules. What it ruled was that evidence that the state had already deemed was inadmissible under their rules prejudiced the defendant to a degree that he was entitled to habeas relief. That's not what we have. What we have here is a very lengthy... In fact, AEDPA couldn't even be applied to their evidentiary ruling because the Court of Appeals itself and the state court had ruled that it was inadmissible. What we have here is a state court engaging in a very thorough 14-page opinion analysis of why the evidence was reliable, why it should be admitted under not only state evidentiary law but due process law. And that decision is given AEDPA deference. There was no AEDPA deference to be given to a decision of the state court in Ege to admit the evidence because the state itself had ruled it was inadmissible. The question in Ege was limited to whether or not it was prejudicial to the fact that it constituted due process. So it can stand for the proposition that a hearsay admission made voluntarily, spontaneously to a compatriot in crime violates fundamental fairness when the state court has indeed admitted it pursuant to its own rules and in which a decision is given deference... Chambers is a case where the state court, I think it was Mississippi State Court, admitted the evidence pursuant to its evidentiary rules. So it's like our case in the sense that in both the evidentiary rules said you could let it in. In our case, no one's saying those evidentiary rules are flawed or unconstitutional but in Chambers the court ultimately said that evidentiary rule was unconstitutional. No, Chambers did not involve a case in which evidence was let in. Chambers involved a case in which... My point is a misapplication of evidence rules. That was a case in which the evidence rules of Mississippi allowed the state court to do exactly what it did. That's the point I'm making and that's like our case. It is like our case in the sense that it involves the admission of evidence but it is unlike our case because it does not involve a due process analysis of a here statement which has always been analyzed and considered under the Confrontation Clause. Chambers, the right to present a defense, which is what they found that Chambers had, has always been around. That is clearly established law, that if you are not allowed to present evidence in your defense, which in Chambers was a repudiation of a confession of the defendant, that petitioner was not allowed to present, that had to come in. The right to present a defense, this 14th Amendment guarantee, has been around since Chambers. That is clearly established and the state is not arguing that there is no 14th Amendment clearly established law but the argument is that there is no clearly established law that imposes or has a due process analysis in the context of a hearsay statement. And I believe that Wright v. Van Patten, Panetti v. Quarterman, Carey v. Muslata, House v. Hatch and the rest of them stand for the proposition that it has to be very limited before this court can say that it is clearly established so that it then overturns or reverses what the state court has done. Because remember, AEDPA is a backward looking standard. Before the state is in essence punished for an evidentiary ruling, it has to have been clear to them that they were wrong when they did it. No case has ever applied a due process analysis to what has traditionally been under a confrontation clause. Now whether that develops later or not, whether that is something that law is headed in, the direction it is headed in, is irrelevant for purposes of whether the Michigan Court of Appeals should have known that it was wrong when it did that. Thank you. What was the delay? So Gorski testifies in front of the federal grand jury in 1984. The charging decisions are in 1995. And as I understand, one way of looking at the case is getting your hands on the Gorski transcript was relevant to the charging decision and important to the theory of guilt. What happened? Why that delay? Nancy Alberts, who was the Wayne County charging prosecutor at the time, testified at a lengthy evidentiary hearing when the defendant initially made a motion to dismiss for speedy trial. Just tell me the answer. She testified very clearly that it was a factor. There were other factors. That's not the question I'm asking. Why the delay? Gorski testifies to a grand jury in 1984. Are you making the point that the prosecutors were never given access to this until 1995? No, they knew about it. They knew about it in 1984. They knew about it, and it did not become admissible under state law until 1994 when the Michigan Court of Appeals made the decision on people versus pool. It was at that point that the state law said... They knew about it from the beginning, but they didn't think it had an impact on the charging decision until this change in state evidentiary rules. I'm not sure they knew about it in 1984 because my understanding of the record was Gorski was interviewed by police and he denied any knowledge. It wasn't until later that he was brought up in front of a grand jury testimony that he then said under oath that he had this statement. Then he was re-interviewed and he confirmed it. Now there is some indication in the record that he did talk to another compatriot, not Gorski, Gorski that is, and made some indication that he had been told... made this statement. But to authorities, no statement was made until later. But even if that was true, even if the authorities knew about the statement early on, they couldn't have used it in trial until people versus pool came along to let them use it. And Nancy Alberts, who was the county prosecutor at the time, indicated that certainly the admission of that or the appropriateness of using that evidence became a factor in the charging decision, but so did other things. When was the $2,000 check to Adams written? After the murder. Okay, but that's my question, when? Shortly after, I don't know the exact time. Within weeks, is that the point? It could have been within weeks or months. What did the check say on it that made it clear it wasn't, say, classic payroll check? I don't believe there was anything on the check that made it clear it wasn't classic payroll check. His claim was that he had done, I think, painting or some kind of maintenance work in order to get that check. The prosecutor's theory, obviously, was different, that it was made in payment or partial payment of services rendered for killing Anna Turetsky. All of those facts were placed in front of the jury. Was he paid? Was he on the payroll in the sense he got paid every two weeks? I don't know if he got paid every two weeks, but he was an employee of the clinic, yes. Adams, that is. Well, I'm trying to figure out if the $2,000 check, if that amount is similar to the paychecks he regularly got. That's all I'm asking. I don't know if that's true. I do know he was paid by the clinic and he had been employed there. In fact, he was the one that got Larry Gorski his job and that he had worked and was an acquaintance and a friend of Dr. Desai's. I don't know if the $2,000 was the same as he was weekly or monthly or whatever getting. Your Honor, sorry. He was working at the clinic where the victim, the clinic where the victim ran. The victim worked at, they were in charge of both. They worked together on both. Eventually they split up and she was at the Trenton Clinic and Dr. Desai stayed at the Trenton Clinic. But I thought that's where Adams was working. And testimony was that he had worked with and knew the victim because of the association with the clinic, yes. Okay. Well, look at your full rebuttal. Let's hear from your friend on the other side. Thank you. Thank you. Mr. Lightman. May it please the Court, Matthew Lightman on behalf of Dr. Desai. Let me start by thanking the Court for expediting this hearing. It's very much appreciated given Dr. Desai's circumstances and my own. Let me jump in with the clearly established question that Ms. Moody spent a substantial time on. And Judge Sutton, I think you're exactly correct that a general principle can establish clearly, can supply clearly established federal law. That's exactly what the United States Supreme Court just said in Marshall v. Rogers, a 2013 case, 133, Supreme Court, 1446, page 1449. And in that same case, the Supreme Court said there does not have to be a factually on point Supreme Court decision to have clearly established federal law. So what do you do about the other thing the U.S. Supreme Court has said, which is that the more general the principle, the more likely it is that the state court is going to have applied it reasonably, even if incorrectly. I accept that burden wholeheartedly. And I hope to persuade you that even with the deference that comes along with the general principle that I'm not going to deny for one second that this was by any measure wholly unreasonable. That's what I hope to persuade the Court. Let me just say a few more words on the clearly established principle that I'd like the Court to apply. This Court has repeatedly applied the principle that a fundamentally unfair evidentiary rule can violate due process in such a way as to entitle a petitioner to relief under AEDPA. That's what happened in each case. We've repeatedly mentioned it. It's a pretty small universe of cases where after AEDPA, you know, the petitioner wins. The petitioner wins in Yukins, but the Court has acknowledged the principle in Brown v. O'Day, Apinovich v. Houck. Each case, I suggest, carries the day here. What each stands for, I respectfully suggest, is that it is clearly established, one, that a fundamentally unfair evidentiary ruling violates clearly established federal law, namely the Chamber's decision. That's what the panel held there. And two, that it's a violation of that clearly established federal law if the ruling admits fundamentally unreliable evidence that unquestionably makes the difference between conviction and acquittal. That's exactly what happened here. So I wasn't thinking you guys were invoking Chambers. I didn't think of this as a Chambers case. Chambers is one of the cases we are invoking, Judge Sutton, because... But, I mean, that's about cross-examination of one witness, excluding other witnesses. This is the admission of evidence. What I'm relying on, Judge Sutton, is what this Court said about Chambers in each. And I'm asking this panel to follow what that panel did. And that panel indicated what it did. It could only have granted habeas relief in that case if it concluded that there is a clearly established rule barring exactly what the trial court did there, namely admitting fundamentally unreliable evidence that made the difference between conviction and acquittal. It found that rule in Chambers. You may or may not agree with that reading of Chambers, but I respectfully suggest that's what the panel held. That's how they read Chambers. And I'm invoking Chambers as determined to be clearly established by this Court in each. But I'm not relying only on Chambers. I'm not relying only on each. I think it's equally instructive to look at two other bodies of Supreme Court law. Well, before we move beyond, I guess we'll call it eej, it's a pretty serious distinction between this evidentiary record and the allegedly flawed admission of this evidence, an evidence where there's no foundation and it says there's a 3.5 million to 1 likelihood that the criminal defendant is the murderer. I mean, that is astonishingly prejudicial evidence when it has no foundation. And the poor jury is sitting there going, did you hear what he said, 3.5 million to 1? That's clearly beyond a reasonable doubt. There's no doubt that the scientific evidence in eej kind of has a special place on the spectrum. And I'm not going to suggest to you that this evidence was just like that. But what this evidence was was so powerful that it gets in that same universe of powerful evidence that has to be reliable before it's admitted. And we know that, just this morning I reread the Bruton case.  And that the hearsay confession of the accomplice is so powerful, is so damning that we need to take extra special considerations. It's so powerful that the court in Bruton said even a jury instruction isn't enough to undo the harm if it comes in. So are we in the scientific evidence realm, 3.5 million to 1? We're not quite there, Judge Sutton. But I think we are over a line of the type of evidence that is so strong and so prejudicial that even if not scientific, it better be awfully darn reliable if it's going to make the difference between conviction and acquittal. And this evidence not only made the difference between conviction and acquittal, it made the difference between being charged and convicted. That's a huge difference. On the clearly established issue, let me invoke two other bodies of Supreme Court law. One is the Manson v. Braithwaite I.D. lineup cases. And what those cases stand for, I suggest, is that where there is government culpability, the Due Process Clause requires reliability of evidence that is connected to government culpability. What the Manson Court said is in those circumstances, reliability is the linchpin of due process. The culpability here, Judge Sutton, gets to a question that you asked Ms. Moody. You said, why the delay? The delay here that is culpable in the state is not charging Steve Adams. They say they couldn't have charged Dr. Desai because the alleged confession by Adams wasn't admissible against Desai. It's certainly admissible against Steve Adams the minute they find out about it. And they wait and wait and wait. And in the testimony... But why is that culpable? I mean, they could make the choice that we're either going to try them together or not at all. Well, it's culpable in this sense, Judge Sutton. I mean, that by itself could be outrageous to just get the hitman and not get the person allegedly behind the hitman? It's culpable in this sense here. Culpable in the sense that it deprives Dr. Desai of the ability to cross-examine Adams on the primary piece of evidence. And when the state makes that decision, whether you're going to make a normative judgment that it's culpable, they bear some responsibility. When they make that tactical decision, and Ms. Albert said there was a benefit to them in trying together, an economy of scale. When they make that tactical decision, Judge Sutton, it's not fair then to allow them to insulate the key piece of evidence from cross-examination because Adams invokes the Fifth Amendment. The other body of law I want to talk about for a moment and clearly establish is the transformation of the Confrontation Clause jurisprudence and how that helps us here on the clearly established issue. If you go back to really a key decision in this line of cases, White v. Illinois, that's a case where there's a Confrontation Clause question and the court splits seven to two. And the seven justices in the majority say reliability is a Confrontation Clause issue. We're not going to revisit the test for Confrontation Clause. The two concurring justices, Thomas and Scalia, say no. Reliability is a due process concern. The key takeaway is nobody on that court suggests somehow that reliability is not a constitutional concern. The only fight is what bucket are we digging in when we're looking at the reliability of hearsay. And ultimately, what happens is the Thomas-Scalia approach, the one that says reliability is a due process concern, wins out. It wins out in Crawford and it explicitly wins out in Davis when the court adopts the exact proposal that Justice Thomas put forward. If it's testimonial. If it's testimonial. But the story behind Justice Thomas' approach, part of that story, part of the reasoning is the Due Process Clause already guards against reliability. That's what he said in White v. Illinois. So I suggest when you put the three cases together, the trilogy, White, Crawford, and Davis, you come up with a principle that the court has determined that reliability questions of hearsay are to be evaluated under the Due Process Clause. I think I'm with you on that. I just think the problem you have is there's an awful lot of other ways to put reliability to a crucible. I'm sorry, I didn't hear you. Put reliability into a crucible. So, for example, the Constitution guarantees certain rights for a criminal in a trial. Confrontation, cross-examination, right to good counsel. All of that stuff, that's what brings out reliability, right? Cross-examination, adversarial process. Evidentiary rules, state evidentiary rules, when properly applied, and no one's saying this was either an unconstitutional state evidentiary rule or unconstitutionally applied evidentiary rule or improperly applied under state law, those things help you with reliability. So it's not that due process has no role, it's just it's the backstop behind a lot of other things, and then we're doing it with AEDPA. Judge Sutton, I think that you have raised a precise issue raised by the Perry v. New Hampshire case where the Supreme Court said pretty strongly just what you're saying, that due process generally doesn't come in and apply a reliability check because we have all these other tools that serve that purpose. The problem here is that the primary tool to serve that purpose with respect to testing the reliability of Adams' alleged confession, namely cross-examination of Adams, was not available. The record, I think, is pretty clear  he would have done two critical things. He would have denied committing the murder, and he would have denied confessing to Gorski. We know that because he denied committing the murder many times under circumstances that suggest it was truthful, primarily when the state offered to dismiss all the charges against him if he would only come clean and admit the murder. At that point, on the record, in a page cited to you, he said no because he didn't do it. That's almost a statement against his interest because it would have been in his interest to get out from under a murder check. So cross-examination of Adams, the tool that's missing here, would have gotten us to the truth. But cross-examination wasn't denied him for any unconstitutional reason. It was the way the case came out. The fact that it was denied allowed the admission, uncontradicted, of this fundamentally unreliable piece of evidence, and that was the violation of due process. Because even if the state rules allowed the admission of this confession and the state rules did, that doesn't mean that the due process clause allows decide to be convicted without the ability to confront this fundamentally unreliable evidence. So let me talk just for a moment and try to get over my high burden that I don't want to deny and I want to accept. How do I show you that this Court of Appeals decision was so unreasonable? I think it starts with this premise. Almost 15 years ago, the state of Michigan salvaged this prosecution by persuading a panel of the Michigan Court of Appeals that included Judge Griffin, now on this Court, that it could not have charged Dr. Desai without Adams' confession because the rest of the evidence was so weak that it couldn't even get past their preliminary exam. The Court of Appeals panel of the Michigan Court of Appeals that decided this case completely ignored that concession, didn't even acknowledge it, and decided without citing any new evidence since the prosecution made that concession that the evidence here was so strong that not only did it establish probable cause, which the state of Michigan said it didn't, it was actually sufficient to prove guilt beyond a reasonable doubt. That gives a flavor to me of unreasonableness, of a court that is not willing to face up to the difficult facts that get in the way of its conclusion. So I think you start there in terms of how the decision was unreasonable. They didn't face up to the difficult question of what would cross-examination of Adams have revealed. The Supreme Court tells us in Idaho v. Wright that a hearsay statement is unreliable if cross-examination would have more than marginal utility. And I just explained, this would have been explosive, this would have been a game-changer, and the Michigan Court of Appeals never touched on that. The Michigan Court of Appeals said that the alleged confession was consistent with the autopsy. They didn't acknowledge, as we cited in our brief, that it was fundamentally inconsistent with the original autopsy that ruled out ligature strangulation, and the alleged confession includes ligature strangulation. How did the dissolution agreement... So I take it Desai was going to owe a certain amount of money. What was the amount owed and when was it due in connection with the timing of the murder? I'm not certain about that, Judge Sutton. What I know is that with respect to the motive here, I think we've put forth, and Dr. Desai put forth at trial, a pretty persuasive case that it was in his interest to keep Ms. Tereske exactly where she was, running a clinic that was generating enough money that kept him with a substantial salary. How about the life insurance policy? The life insurance policy was, I think, very effectively countered by the defense at trial. It was recommended not by Dr. Desai, but independently by an insurance agent. Ms. Tereske approved the idea before it was even presented to Dr. Desai. And this is standard key man insurance that most small businesses have because they could be in very bad shape if one of their owners passed away or wasn't able to participate in the business, and then there wouldn't be a way to buy them out, to afford to buy them out. It wasn't nearly this strong evidence of motive that it's made out to be. So this close relationship, he was afraid she would die. Excuse me? This close relationship led him to be very anxious about a fear of her dying. No, look, I don't want to overstate that he was in fear of her death, but he certainly had no motive to get rid of her. I think that's critical. The unreasonableness is really set forth at length at pages 50 to 55 of our brief. And if you go through there, what you see is the Michigan Court of Appeals repeatedly ignoring facts that are at odds with their conclusion. And when you add it all up, this refusal to step forward and acknowledge the prosecution's concession about the role of this confession in the case, and the fact that their opinion contains so many contra-record and contra-factual conclusions, I think the only conclusion we're left with is that the Michigan Court of Appeals' denial of the due process claim was fundamentally unreasonable, so unreasonable that it crosses over the heavy burden that we have to carry in order to be entitled to habeas relief here. Are you happy to answer any other questions? No. Thank you for your argument. Ms. Moody, I think you have some rebuttal. Thank you, Your Honor. I'd like to start with the point made by you, Judge Sutton, that the more general the standard, the more leeway the state court is given. Whether or not there's clearly established law which the state asserts can be dispositive, there is a huge question of whether they unreasonably apply that notion of fundamental fairness. And the Supreme Court has been clear that there is an extreme deference that's given to the state court's opinion. The Michigan Court of Appeals here engaged in a lengthy merits analysis. At least seven pages of their 14 pages was a one single-spaced, small-type, lengthy analysis of why this admission of the statement did not violate notions of fundamental fairness. Lenico v. Lett and other cases like that from the Supreme Court I think were largely ignored by the district court when it granted here. She disregarded all of the recent admonishments from the U.S. Supreme Court when she second-guessed not only the jury's verdict, which is clearly you can read that in the district court's opinion, and disregarded and second-guessed the Michigan Court of Appeals lengthy analysis. The reason why the Michigan Court of Appeals found this statement did not violate notions of due process were many. They were, in fact, they found the confession was reliable because it was consistent with the evidence. The fact that he knew the body had been moved, the fact that he knew that the time of death could have been placed earlier, which in fact the evidence showed the time of death was November 3rd, like he had indicated. It was consistent with the victim's injuries, the collapsed windpipe, the bruises and the scratches, and the fact there is nothing under her fingernails. He admitted to washing out the fingernails. It was consistent with how she was murdered. What do you say about Dr. Desai's very bad luck in this case? Had he been tried in 84, he would have had a state evidentiary rule, which would have been very helpful. In 84, he would have been governed by Roberts, not Crawford, and if he'd been tried around 84, he surely would have had his habeas petition before 96, and thus wouldn't have had AEDPA I don't remember a criminal defendant with so much bad luck in one case. How do you respond to that? I don't think it's bad luck. I think it's justice. The evidence shows he clearly did it. If it had been inadmissible, I think he would have been convicted anyway. The evidence of his guilt was overwhelming, things he could not explain. How did he know they would find a body before he knew she was dead? How did he know where to go to find the body that evening? He was followed by police to the exact spot where he had aligned... You have to admit that the prosecutors themselves didn't think they could do this without the change in state evidentiary law. That seems pretty clear. They said that they wanted to wait... Forget what they said. Forget what they said. Just look at their actions. I mean, I don't understand how there isn't room for discussion on that. Because the Court of Appeals found that this evidence was harmless. And Nancy Alberts, the failure to charge or whatever way back in the 80s... I'm not saying harmless, harmful. I'm just saying look at their actions. Their actions show that but for the change in the state evidentiary rule, it's not clear they would have charged him. Now, that can just be prosecutorial discretion. It doesn't prove they didn't have a case. That's not my point. My point is you just look at their actions. They seem to... That seemed to have a but for relation to this case. They clearly did want the admission of that statement. That is true. And the refusal to charge him until they had all of their evidence in place is certainly an indication that they wanted all of the evidence they could possibly have before they charged him. What I'm saying is what the Michigan Court of Appeals relied on to find that it was reliable was extensive. And even if incorrect, certainly wasn't unreasonable. They looked at the circumstances of the confession... Extensive, but counsel tells us laced with misinformation. There is no misinformation. The misinformation that petitioner and the district court talk about to make the circumstances of the confession inherently unreliable are conjecture. The fact that there was people coming in and out of the bathroom, that's not true. It's nowhere in the record. The fact that Adams had a hearing loss is irrelevant. Gorski didn't have a hearing loss. Gorski was the listener. Adams was the speaker. The fact that there was loud music playing, we have no indication whether the band was on the break or they were closing up to go. We have no idea that there was any loud music, that there were other people present in the bathroom, that Gorski wasn't fully able to hear. And the circumstances of the confession or the statement were reliable. They met at a bar. They were compatriots in crime before. Gorski had been asked by Adams to be a hitman. Adams had confessed his prescription fraud to Gorski. They were high school friends. This is somebody he would have spontaneously and voluntarily admitted this action to. He was aware of all the parties. They're at a bar. They went into a bathroom, had a private conversation. I think your time is going well over. I let Mr. Lightman go a little over. You've now gone a little further. Are there other questions? I'll give you one more sentence with no dependent clauses. No. Even if there is clearly established law that governs this due process analysis, there was at the very least a reasonable application of it. Okay. Thank you very much. Thanks to both of you for your excellent briefs and very helpful oral arguments. We appreciate it.